**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

GABIEL LOZADA-MANZANO, ET AL.

    **PlaintiffS**

        v.                    **CIVIL NO. 15-2601 (RAM)**

UNITED STATES OF AMERICA

    **Defendant**

---

**OPINION AND ORDER**

Raúl M. Arias-Marxuach, United States District Judge

Pending before the Court are plaintiffs Gabiel Lozada-Manzano and his parents Cesar Lozada and Belkis Manzano's (collectively, "Plaintiffs") *Motion Requesting Summary Judgment* ("MSJ") and *Plaintiff's [sic] Uncontested Material Facts and of Law* ("SUMF"). (Docket Nos. 126 and 127). Also pending before the Court is Defendant United States of America's ("Defendant" or "the Government") *Answers to Plaintiff's Statements of Uncontested Material Facts, Opposition to Plaintiff's Motion for Summary Judgment and Cross Motion For Summary Judgment* ("Cross-MSJ") which included additional uncontested facts. (Docket No. 131). Having considered the parties' submissions, the Court **DENIES** Plaintiffs' MSJ at Docket No. 126 and **GRANTS** Defendant's Cross-MSJ at Docket No. 131. Judgment of dismissal with prejudice shall be entered accordingly.

## I.   PROCEDURAL BACKGROUND

### A. Criminal Case No. 13-0292[1]

On May 22, 2013, a Grand Jury indicted Plaintiff Gabiel
Lozada-Manzano ("Lozada-Manzano") in Criminal Case No. 13-292 of
two counts: (1) 18 U.S.C § 2191(1) and 2191(2) (carjacking; aiding
and abetting); and (2) 18 U.S.C. § 924(c)(1)(A)(ii) (use of a
firearm during and in relation to a crime of violence; aiding and
abetting). (Docket No. 3). The indictment arose from Lozada-
Manzano's alleged brandishing of a firearm during the carjacking
of a green 1998 Mitsubishi Montero following the home invasion of
Mr. Alejandro Caloca Calbo's (Mr. Caloca") house. Id. at 1-2. Ten
months later, at a hearing before United States Magistrate Judge
Camille Vélez-Rivé, Lozada-Manzano's counsel stated his intention
to file a motion to dismiss the indictment and a notice of alibi.
(Docket No. 50). The minutes of the hearing reflect that counsel
"presented conditions of bail which could be set[,]" conditions of
release were set, and an Appearance Bond was subsequently filed.
(Docket Nos. 51 and 52).

On March 18, 2014, Lozada-Manzano's counsel filed a *Motion to
Dismiss Indictment*. (Docket No. 48). Defendant did not respond. On
March 31, 2014, Lozada-Manzano's counsel filed a *Notice of Alibi*
and Defendant responded on April 17, 2014. (Docket Nos. 53 and

---

[1] Any docket citation in this section only refers to docket entries in Criminal
Case No. 13-292.

55). On May 6, 2014, Defendant filed a motion to dismiss the case against Lozada-Manzano *without prejudice* "in the interest of justice." (Docket No. 59). On May 7, 2014, United States District Judge Daniel Dominguez granted the motion pursuant to Fed. R. Crim. P. 48(a) and Judgment of Dismissal was entered that same day. (Docket Nos. 60 and 61).

### B. Civil Case No. 15-2601

On October 21, 2015, Plaintiffs filed a *Complaint* against the Government pursuant to the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution and for malicious prosecution per the Federal Tort Claims Act ("FTCA"), 28 U.S.C. 2671, et seq. and Articles 1802 and 1803 of the Puerto Rico Civil Code, 32 L.P.R.A. §§ 5141 and 5142. (Docket. No. 1). Plaintiffs aver that "negligently supervised federal officials tried to bring about the wrongful conviction and imprisonment of plaintiff Lozada-Manzano in the Federal District Court[.]" Id. at 1. Because of this alleged wrongful conviction, Lozada-Manzano was imprisoned for ten (10) months until the Court dismissed the charges against him. Id. at 2. Plaintiffs request $7,7000,000 in damages arising from Lozada-Manzano's purported wrongful arrest, prosecution, and incarceration. Id.

On September 21, 2016, the Government filed a *Motion to Dismiss* for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and failure to state a cognizable claim for relief

under Fed. R. Civ. P. 12(b)(6). (Docket Nos. 15 and 16). United States District Judge Carmen Cerezo granted it in part and denied it in part. (Docket No. 38). She dismissed the constitutional claims given that United States Supreme Court precedent holds "that the FTCA does not waive the government's sovereign immunity for constitutional torts." Id. at 1. The Order also held that "all of the allegations involving a purported 'negligent investigation' by particular, but unnamed, law enforcement agents were geared to establish the constitutional torts" which were "just dismissed." Id. at 2. Thus, the only remaining claims are those for malicious prosecution under the FTCA. Id. at 3. The Order was silent as to the Article 1802 and 1803 claims. *Partial Judgment* dismissing the constitutional claims was entered on August 4, 2017. (Docket No. 39).

The case was transferred to the undersigned on June 20, 2019. (Docket No. 87). On July 24, 2020, Plaintiffs filed an MSJ and SMUF alleging that the Federal Bureau of Investigation ("FBI") and the United States Attorney's Office maliciously prosecuted Lozada-Manzano by fabricating evidence against him or failing to disclose exculpatory evidence. (Docket Nos. 126 and 127). Plaintiffs argue that these actions, coupled with purported misrepresentations to the Grand Jury, were done to indict and convict Lozada-Manzano. (Docket No. 126 at 2). However, officers such as Task Force Officer Lester Pérez-Difre ("T.F.O. Pérez-Difre") allegedly knew that

Lozada-Manzano had been arrested an hour earlier in connection to the carjacking of a Toyota Corolla. Id. at 10, 14-15.

On September 9, 2020, Defendant replied and filed its Cross-MSJ. (Docket No. 131). It avers that most of Plaintiffs' material facts and accompanying exhibits are either inadmissible because they are hearsay, or because they are subjective characterizations of what allegedly occurred during and after the home invasion. Id. at 1-7 and 15. Defendant also claims that Lozada-Manzano's 2013 indictment was based on probable cause because it was grounded on three positive photographic identifications by three minor victims on three separate dates. Id. at 20 and 22-23. Lastly, the Cross-MSJ posits that Plaintiffs cannot prove that the Government submitted false evidence to the Grand Jury. Id. at 23. Plaintiffs replied on September 23, 2020. (Docket Nos. 134-135).

## II.   STANDARD GOVERNING FED. R. CIV. P. 56 SUMMARY JUDGMENT

Summary judgment is proper under Fed. R. Civ. P. 56(a) if a movant shows "no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." A dispute is genuine when "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." Alicea v. Wilkie, 2020 WL 1547064, at *2 (D.P.R. 2020) (quotation omitted). A fact is material if it "may potentially 'affect the outcome of the suit under governing law.'" Carlos Rivera Cuevas, et al. v. Municipality of Naranjito, et al., 2021 WL 359979, at *2

(D.P.R. 2021) (quoting <u>Albite v. Polytechnic Univ. of Puerto Rico,</u>
<u>Inc.</u>, 5 F. Supp. 3d 191, 195 (D.P.R. 2014)).

The movant bears the initial burden of proof that there is no
genuine issue of material fact. *See* <u>Feliciano-Munoz v. Rebarber-</u>
<u>Ocasio</u>, 970 F.3d 53, 62 (1st Cir. 2020) (citation omitted). Yet,
the non-movant may "defeat a summary judgment motion by
demonstrating, through submissions of evidentiary quality, that a
trialworthy issue persists." <u>Robinson v. Town of Marshfield</u>, 950
F.3d 21, 24 (1st Cir. 2020) (quotation omitted). When evaluating
a motion for summary judgment, "a court should review the record
in its entirety and **refrain from making credibility determinations**
**or weighing the evidence**." <u>Carlos Rivera Cuevas, et al.</u>, 2021 WL
359979, at *2 (citation omitted) (emphasis in original).  The First
Circuit Court of Appeals ("First Circuit") has been clear that
"**[e]ven in cases where elusive concepts such as motive or intent**
**are at issue, summary judgment may be appropriate if the nonmoving**
**party rests merely upon conclusory allegations, improbable**
**inferences, and unsupported speculation**." <u>Turner v. Wall</u>, 2020 WL
5543935, at *1 (1st Cir. 2020) (quoting <u>Medina-Munoz</u> v. <u>R.J.</u>
<u>Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990)).

Local Rule 56 also governs summary judgment. *See* L. CV. R.
56. Per this Rule, a nonmoving party must "admit, deny or qualify
the facts supporting the motion for summary judgment by reference
to each numbered paragraph of the moving party's statement of

material facts." Id. Adequately supported facts "shall be deemed admitted unless controverted in the manner prescribed by the local rule." Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection Techs. GmbH, 781 F.3d 510, 520 (1st Cir. 2015) (quotation omitted). The Rule also allows a non-movant to present additional facts "in a separate section." L.CV. R. 56 (c). Parties may not incorporate numerous additional facts within their opposition. See Martinez v. United States, 2020 WL 5039242, at * 2 (D.P.R. 2020) (citations omitted). Litigants ignore Rule 26 at their peril. Id.

### III. FINDINGS OF FACT

After analyzing Plaintiffs' SUMF (Docket No. 127), Defendant's additional facts (Docket No. 131) and Plaintiffs' reply to said facts (Docket No. 135), and **only crediting material facts** that are **properly supported by a record citation and uncontroverted**, the Court makes the following findings of facts:[2]

Home Invasion and Carjacking of Mitsubishi Montero

1.  On July 22, 2012, between 3:00pm and 3:15 p.m., Alejandro Caloca Calbo ("Mr. Caloca") went to the balcony area of his house after observing two (2) individuals get out of a vehicle, point a firearm at him, tell him to open the iron

---

[2] Reference to a Finding of Fact shall be cited as follows: (Fact ¶ _).

gate of his garage and demand entry to his home. (Docket Nos. 127 ¶ 27; 131 ¶ 3).[3]

2.   Mr. Caloca's house was located at 246 St., Urb. Country Club, Carolina, Puerto Rico. (Docket No. 131 ¶ 3).

3.   Two (2) robbers entered Mr. Caloca's house during the home invasion. (Docket No. 127 ¶ 22).

4.   The robbers were masked during the entirety of the home invasion. Id. ¶ 24.

5.   During the home invasion, Mr. Caloca was gagged, bound, and had his hands tied with a plastic wrap while the robbers ransacked his whole house and went through his bedroom drawers and the entire kitchen. Id. ¶¶ 25-26.

6.   At around 4:30 p.m., Mr. Caloca's daughter Sadie Caloca Marrero ("Sadie"), his wife Mrs. Nilda Marrero, and his three, then minor, grandchildren Andrick Melendez Caloca ("Andrick") (15 years old), Alondra Melendez Caloca ("Alondra") (13 years old) and Jadie Melendez Caloca ("Jadie") (11 years old) (collectively the "minors"), arrived at the house from the beach where they found an ongoing home invasion. (Docket Nos. 131 ¶ 4; 127 ¶ 28).

---

[3] Plaintiffs' SMUF describes the vehicle as a white taxi van, whereas Defendant's additional facts describe it as a minivan. (Docket Nos. 127 § 21; 131 ¶ 3).

7.   Once they arrived at the house, Sadie parked in front of the house and Jadie went running towards the inside. (Docket No. 127 ¶ 29).

8.   After going inside the house, Jadie saw Mr. Caloca tied up and gagged on the floor and two males robbing the house. Id.

9.   One of the robbers grabbed Jadie and placed a gun to her forehead. This robber was dressed fully in black, had "very big sunglasses" and his face was covered with a piece of cloth and a cap. Id. ¶ 30.[4]

10.  Jadie identified Lozada-Manzano as the robber with the gun and described him as being the heavier of the two robbers. Id. ¶ 31.

11.  The other, skinnier robber had a red piece of cloth on his face and was also wearing "real big sunglasses." He was not identified. Id. ¶¶ 30-32.

12.  Per Sadie's deposition, one of the robbers carried a gun while the other one had a set of cutting pliers. Id. ¶ 38.

13.  The robbers went out of the house around 4:30pm when Sadie arrived with her children. Id. ¶ 33.

14.  Sadie remembers arriving at Mr. Caloca's house at around 3:00pm to 4:00pm. Id. ¶ 34.

---

[4] Plaintiffs' SMUF states that the heavier robber placed a gun against Sadie's forehead, but Jadie's deposition proffered by Plaintiffs shows that the robber placed a gun against Jadie's forehead. (Docket Nos. 127 ¶ 30; 132-1 at 10).

15.  Alondra states in her deposition that they arrived after
     they left the beach around 4:00pm to 5:00pm. Id. ¶ 35.

16.  Mr. Caloca testified in his deposition that the robbers
     left close to 4:30pm. He testified as such because he
     believes he spent one and a half (1.5) hours tied up in
     the house. Id. ¶ 27.

17.  Sadie's deposition states that after the robbers went out
     of the house, they approached her and when she saw them
     facing her, she lowered her head and the robbers asked for
     the keys to her 1998 green Mitsubishi Montero ("Montero").
     (Docket No. 132-4 at 30).

18.  One of the robbers, the one with a gun, placed the gun
     against Sadie to force her to hand over the keys to her
     vehicle. (Docket No. 127 ¶ 38).

19.  Sadie's deposition states that "since she still had the
     keys in her hand," she handed the keys "to them without
     looking at their faces." (Docket No. 132-4 at 30).

20.  Sadie's further testified that she did not see any of the
     robbers' faces. (Docket No. 127 ¶ 36).

21.  She answered "no" to Plaintiffs' counsel's question whether
     she could identify the robbers "from what [she] saw" of
     them. (Docket No. 132-4 at 29-30).

22.  While the two robbers were boarding the Montero to steal
     it, Andrick went inside the van to retrieve his mobile
     phone and placed a 911 call. (Docket No. 127 ¶¶ 42 and 44).

23.  Only one phone call was made to the 911 system by the
     victims. Id. ¶¶ 43, 50.

24.  While the carjacking of the Montero was going on, Jadie
     saw Andrick place the 911 call. Id. ¶ 45.

25.  Andrick used the phone number (787) 422-9877 to call the
     911 system and he identified the number as his during his
     deposition. Id. ¶ 46.

26.  The robber with the gun got the keys and sat in the driver's
     seat of the Montero while the one with the pliers sat in
     the rear seat behind the passenger's seat and they left
     Mr. Caloca's house. Id. ¶¶ 39-40.

27.  The Montero was abandoned in front of a laundromat in the
     parking lot of the Borinquen Commercial Center. (Docket
     Nos. 127 ¶ 51; 131 ¶ 5).

28.  Borinquen Commercial Center is about seven (7) minutes away
     by car from Mr. Caloca's house. (Docket No. 127 ¶ 52).

29.  None of the victims saw the alleged car change the robbers
     made from the Montero to another car at Borinquen
     Commercial Center. Id. ¶ 54.

Criminal Investigation of Lozada-Manzano

30. On July 22, 2012 the Carolina Command Center Report PPR-589 was created as to complaint # 2012-8-316-04457. The PPR-589 is generated at 4:38pm stating that two individuals had robbed the victims. Id. ¶ 55.

31. Amanda C. Soto-Ortega was a Special Assistant U.S. Attorney ("SAUSA Soto") assigned to prosecute cases related to firearms, controlled substances and violent crimes, including but not limited to carjackings, during November 2011 to November 2014. (Docket No. 131 ¶ 1).

32. Between April 2013 to May 2013, a criminal case against Lozada-Manzano was referred to her for prosecution by the FBI. Id. ¶ 2.

33. Police Officer Jose Rivera ("Agent Rivera") was personally involved in the criminal investigation of Lozada-Manzano as an FBI Task Force Officer. Id. ¶ 16.

34. He had been a Task Force Officer since May 2012 and a Police Officer since the year 2000. Id.

35. As part of the FBI's investigation, the Puerto Rico Police Department ("PRPD") performed individual photo lineups for the victims to review. During these lineups, the minors identified Lozada-Manzano as one of the perpetrators of the home invasion and carjacking of July 22, 2012. Id. ¶ 6.

36. The five (5) victims were given ample time to review the nine (9) photographs prior to circling Lozada-Manzano's for ID purposes and were advised by Agent Rivera if they were sure of their identification. Id. ¶ 24.[5]

Mr. Caloca's Testimony as to Lozada-Manzano's Identification

37. Mr. Caloca and Sadie stated in their depositions that they could not identify or recognize any of the robbers. (Docket Nos. 127 ¶ 75; 132-3 at 48; 132-4 at 29-30).

38. During Mr. Caloca's deposition, Defendant's counsel "clear[ed] up" for the record "that Mr. Alejandro was not confronted with a line up." (Docket No. 132-3 at 38).

39. FBI agents went to Mr. Caloca's house four (4) or five (5) times to interview the victims. (Docket No. 127 ¶ 69).

40. Mr. Caloca testified in his deposition that at least on one of those visits, agents brought a book containing pictures of possible suspects of the crime. Id. at ¶ 70.

41. He testified that he always told the FBI agents that the assailants were masked. Id. ¶ 79.

42. He was also interviewed by SAUSA Soto at the federal building in Hato Rey. Id. ¶ 80.

---

[5] The Court notes that the first identifications of Lozada-Manzano by Jadie and Andrick occurred in February 2013 before the case was referred to SAUSA Soto. Per Agent Rivera's Sworn Statement, the third identification of Lozada-Manzano by Alondra occurred in April 2013 allegedly in his presence. (Docket No. 131-2 at 3). Plaintiffs do not contest this fact.

43.   Mr. Caloca's deposition shows that he answered "no" to Plaintiffs' counsel's questions whether an agent told him that they believe that any of the persons in the photo array committed a crime. (Docket No. 132-3 at 48).

Identification of Lozada-Manzano by the Three (3) Minor Victims

44.   The minors identified Lozada-Manzano on three different dates in a photo lineup of nine (9) individuals by circling Lozada-Manzano's face or photo. (Docket No. 131 ¶¶ 4 and 24).

45.   In the three photo arrays signed by the minor victims identifying Lozada-Manzano, Sadie's signature appears alongside her children's because they were minors at the time of the investigation. (Docket Nos. 127-17, 127-18, 127-19; 132-4 at 16).[6]

46.   While at least one of the minors stated in their deposition that they told agents they had doubts as to the suspect's identification during the photo lineups, they all testified that they selected Lozada-Manzano because he was the one who looked most similar to one of the robbers. (Docket Nos. 132-1 at 19; 132-2 at 4; 132-5 at 11-12).

---

[6] Plaintiffs and Defendant filed identical copies of the photo arrays signed by the minors and Sadie. (Docket Nos. 127-17 through 127-19; 131-3 through 131-5). Subsequent references to these photo arrays will only cite the exhibits filed alongside Plaintiff's SMUF at Docket No. 127.

Jadie's Identification of Lozada-Manzano

47.   On February 2, 2013 at 5:05 p.m., Jadie identified Lozada-
      Manzano in a photo lineup. (Docket No. 127 ¶ 86).

48.   Jadie never saw the robber who grabbed her and pointed a
      gun at her without a mask. Id. ¶ 37.[7]

49.   Jadie testified that she only noticed the cheekbones a
      little bit on the heavier robber as he "had on the
      sunglasses, plus the mask" and was only able to see "sort
      of like a line". Id. at ¶ 32.

50.   Jadie testified during her deposition that she identified
      Lozada-Manzano because "that's the one that has the
      characteristics, the factions that was more like the
      [robber]." (Docket No. 132-1 at 16).

51.   She also testified that by "factions" she means "the shape
      of the face and the body. Even though it was covered." Id.
      at 22.

52.   Jadie stated in her deposition that she circled Lozada-
      Manzano's face because of "the facial characteristics of
      that person[.]" (Docket No. 132-1 at 10).

53.   She also testified that she told the agents during the
      identification process that the robbers were wearing masks
      during the home invasion. Id. at 19-20.

---

[7] Plaintiffs' SMUF states that Sadie never saw the robbers without a mask.
(Docket No. 127 ¶ 37). But the depositions show that _Jadie_ was the one who
stated to not having seen the robbers without a mask. (Docket No. 132-1 at 26).

54.   Jadie stated that she told the agents during the lineup
      process that Lozada-Manzano was similar to the robber that
      had placed a gun to her head. Id. at 19.

55.   To questions from Plaintiffs' counsel about how close Jadie
      was to the person who put a gun to her head, Jadie stated
      he came towards her and "was very close." Id. at 20.

56.   In her deposition, Jadie confirmed that it was her
      handwriting next to Lozada-Manzano's picture and that the
      additional signature was her mother's. Id. at 10-11.[8]

57.   Jadie testified that nobody forced her, influenced her or
      suggested to her who she should circle. Id. at 11.

58.   To questions from Plaintiffs' counsel if agents had
      suggested to her the identity of who she circled, she
      replied "No, I circled it because he looked like him." Id.
      at 25.

59.   Jadie answered "no" to questions from Plaintiffs' counsel
      if the agents who showed her the photographic lineup ever
      told her "'Do not worry if you don't know exactly the
      person. We'll sort it out later.'" Id.

60.   Jadie testified in her deposition that at least on one
      occasion she was alone with the agents when she identified
      Lozada-Manzano. Id. at 27-28.

---

[8] Sadie's deposition shows that she confirmed that it was her signature and
Jadie's in the February 2, 2013 photo array identifying Lozada-Manzano as one
of the robbers. (Docket Nos. 132-4 at 14-15; 127-17).

61. She answered "yes" to Defendant's counsel's question whether she circled Lozada-Manzano's picture "freely and voluntarily." Id. at 11.

62. The day she circled Lozada-Manzano's picture, Jadie was with her mother. Id. at 28.

Andrick's Identification of Lozada-Manzano

63. On February 14, 2013 at 4:50 p.m., Andrick identified Lozada-Manzano in a photo lineup. (Docket No. 127 ¶ 87).

64. Andrick's deposition states that he remembers several police officers going to his grandfather's house to interview him and show him pictures. (Docket No. 132-5 at 10).

65. When agents showed Andrick the photo lineup, he testified that there was no way to recognize anybody "because these three people were masked." (Docket No. 127 ¶ 72).

66. He stated during his deposition that the robbers' faces were covered with a cloth. (Docket No. 132-5 at 20).

67. Andrick answered that he "suppose[d] so" to questions from Defendant's counsel if he had told agents during the lineups that the robbers were masked. Id. at 24.

68. He answered "no" to Plaintiffs' counsel's question whether anybody had told him about a third robber that was not in his specific recollection. He stated that "[a]s to the

third person, […] I do know that there were few persons there. Maybe three (3) or more." Id. at 21.

69.  To questions from Defendant's counsel whether anybody forced him to circle Lozada-Manzano, Andrick testified that "[f]rom the very beginning it was mentioned that the persons were masked and that what [the victims] were going to be circling were persons that somewhat looked like or were alike." (Docket No. 127 ¶ 73).

70.  Andrick testified that he circled Lozada-Manzano's picture because the shape of his head looked alike to that of one of the robbers. (Docket No. 132-5 at 11-13, 23).

71.  Andrick confirmed during his deposition that he made the circle around Lozada's picture and confirmed that it was his signature next to the picture. Id. at 13.[9]

72.  Andrick answered "no" to Plaintiff's counsel's question whether he felt manipulated in any way while doing the photo identification. Id. at 25.

73.  To questions from Defendant's counsel if any police officer suggested to Andrick to circle Lozada-Manzano based on his impression that Lozada-Manzano looked most alike to one of the robbers, Andrick stated "Well, there were several cops that went there to suggest." Id. at 13.

---

[9] Sadie's deposition shows that she confirmed that both her signature and Andrick's appeared in the February 14, 2013 photo array identifying Lozada-Manzano as one of the robbers. (Docket Nos. 132-4 at 17-18; 127-18).

74.  Andrick's deposition does not show whether either party requested a follow up or clarification to this reply. Id.

75.  Andrick stated he believed his mother was with him when police officers showed him the lineups and he identified Lozada-Manzano as one of the robbers. Id. at 10, 12.

Alondra's Identification of Lozada-Manzano

76.  On April 8, 2013 at 4:35 p.m., Alondra identified Lozada-Manzano in a photo lineup. (Docket No. 127 ¶ 88).

77.  Alondra described the disguises that covered the robbers' faces to the agents. One of the robbers had a cap, sunglasses and gloves, the other seemed to have a t-shirt covering his face. This was described to the agents every time (more than once) they went to interview her. Id. ¶ 78.

78.  Alondra testified that the robber with a cap told her to "shut up[,]" pointed a gun at her and then she understood it was a holdup. (Docket No. 132-2 at 3).

79.  Alondra testified that she circled Lozada-Manzano's face because she "always said that that was the one that looked more like him [the robber] to [her]." Id. at 4.

80.  She testified that she told the agents that she was uncertain about her identification of Lozada-Manzano, but she circled his picture because he was the one "that looked alike the most." Id. at 4-5, 13-14.

81.  During her deposition, she confirmed that she circled
     Lozada-Manzano's picture and that it was her initials on
     top of the picture and her mother's signature. Id. at 5.[10]

82.  She stated that none of the agents ever talked to her alone
     or without her mother. Id. at 14-15.

83.  She also stated that the agents did not suggest to her that
     Lozada-Manzano was one of the possible robbers. Id. at 9.

84.  Alondra answered "no" to questions from Plaintiffs' counsel
     whether she talked with her family about who participated
     in the robbery. Id. at 12.

85.  Alondra was accompanied by her mother when she circled
     Lozada-Manzano's picture. Id. at 4.

Sadie's Testimony as to Lozada-Manzano's Identification

86.  Sadie testified in her deposition that she was interviewed
     on several occasions by police officers and that they came
     with a set of photographs of potential suspects several
     times. (Docket No. 132-4 at 9-10, 13-14).

87.  She also testified that she was interviewed two to three
     times by SAUSA Soto at the federal building in Hato Rey.
     (Docket No. 127 ¶ 81).

88.  During her deposition, Sadie replied "yes" to Defendant's
     counsel's question whether her son and daughters "circled

---

[10] Sadie's deposition shows that she confirmed that it was her signature and
Alondra's in the April 8, 2013 photo array identifying Lozada-Manzano as one of
the robbers. (Docket Nos. 132-4 at 18-20; 127-19).

the face of that person […] because for them it was the person who most resembled the person that committed the crime at [Mr. Caloca's] house." (Docket No. 132-4 at 20-21).

89. Sadie also replied "yes" to Defendant's counsel's question regarding whether the same person was circled in all three photo arrays signed by her children. Id. at 21.

90. She replied "yes" to the same counsel's question whether the photos were in a different order and if "It's the same person, but in a different order of photos?" Id.

91. Sadie answered "no" to questions from Defendant's counsel whether "at the times that you were with your children and the police, did anybody from the police force your children to lie?" Id. at 26.

92. Sadie answered "no" to Plaintiffs' counsel's question "Did any of the agents, federal agents, when they were showing you the pictures, did they ever, at any time, pointed out or suggested to you that anyone of those people, persons in the pictures, committed the crime?" Id. at 38.

93. Sadie answered in the affirmative "exactly" to the same counsel's questions whether the "identification was freely and voluntary by [her] children." Id.

Continuation of Criminal Investigation of Lozada-Manzano

94.  On May 22, 2013, FBI Special Agent Fernando Oliva ("Agent
     Oliva") testified before the Grand Jury. (Docket No. 127-
     23).

95.  SAUSA Soto presented Agent Oliva as a witness before the
     Grand Jury. Id. at 2.

96.  Agent Oliva testified therein that three (3) robbers
     invaded the house. (Docket No. 127 ¶ 102).

97.  Agent Oliva stated that Lozada-Manzano was identified as
     the third assailant. Id. ¶ 103.

98.  He also stated that Lozada-Manzano was the robber who put
     a gun to Jadie's head. Id. ¶ 105.

99.  On May 22, 2013, a Federal Grand Jury returned an
     Indictment against Lozada-Manzano charging him with
     violations to 18 U.S.C. § 2119 (1) and 2) (carjacking;
     aiding and abetting) and 18 U.S.C.§ 924(c)(1)(A)(ii) and
     2) (use of a firearm during and in relation to a crime of
     violence; aiding and abetting) for carjacking of a
     Mitsubishi Montero during a home invasion. (Docket Nos.
     127 ¶ 108; 131 ¶ 7).

100. Lozada-Manzano's then Counsel Luis Rivera Rodriguez
     ("Counsel Rivera") filed several motions in criminal case
     13-292 (DRD) requesting exculpatory material from the
     prosecution. (Docket No. 127 ¶ 111).

101. On June 5, 2013, United States Magistrate Judge Camille Vélez-Rivé held a Detention Hearing; after SAUSA Soto's proffer, particularly as to the positive identification by the three (3) minors, the Court ordered the detention of Lozada-Manzano without bail. (Docket No. 131 ¶ 8).

102. On July 5, 2013, SAUSA Soto filed an Informative Motion as to availability of discovery material. Id. ¶ 9.

103. On July 8, 2013, SAUSA Soto provided Lozada-Manzano with the first discovery package, which included photographs, fingerprints results, PRPD reports, FBI reports, notes and photo lineups, among other documentary evidence. Id. ¶ 10.

104. On October 29, 2013, Defendant filed a Motion to Suppress grounded on the alleged "unbelievable" identification made by two (2) of the minor witnesses. Id. ¶ 11.

105. On December 4, 2013, the Government opposed the Motion to Suppress stating that Lozada-Manzano had failed to evince that the photographic lineups conducted by the PRPD were unreliable and failed to show that the PRDP officers had no probable cause to arrest. Id.

106. In a March 12, 2014 meeting between SAUSA Soto and Counsel Rivera, he informed her, for the first time, of a possible alibi defense. SAUSA Soto advised counsel of her duty to investigate the merits of the alibi defense because it is

standard operating procedure to follow-up on the possible merits of that defense. Id. ¶ 12.

107. On March 13, 2014, Lozada-Manzano declined to be debriefed by SAUSA Soto about his alibi defense. Id. at ¶ 13.

108. On March 13, 2014, United States Magistrate Judge Camille Vélez-Rivé granted a request for emergency bail by Lozada-Manzano. (Docket No. 127 ¶ 121).

109. On March 31, 2014, Counsel Rivera filed a Notice of Alibi Defense on behalf of Lozada-Manzano. (Docket No. 131 ¶ 14).

110. On May 6, 2014, the United States Attorney's Office through SAUSA Soto requested dismissal of the criminal case against Lozada-Manzano without prejudice "in the interest of justice." (Docket Nos. 127 ¶ 124; 131 ¶ 15).

111. On May 7, 2014, United States District Judge Daniel Dominguez granted the dismissal of the indictment against Lozada-Manzano. (Docket No. 127 ¶ 125).

### IV. APPLICABLE LAW

The FTCA provides "a limited congressional waiver of the sovereign immunity of the United States for tortious acts and omissions committed by federal employees acting within the scope of their employment." Díaz-Nieves v. United States, 858 F.3d 678, 683 (1st Cir. 2017) (citation omitted). Under the FTCA, the United States may be held liable as if it were a private individual in similar circumstances. See 28 U.S.C. § 1346(b)(1); see also Solis-

<u>Alarcon v. United States</u>, 662 F.3d 577 (1st Cir. 2011) (quotation omitted). While the FTCA exempts intentional torts from sovereign immunity, it expressly allows the following actions to be brought against the United States: "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" arising out of "acts or omissions of investigative or law enforcement officers of the United States Government." <u>Abreu-Guzman v. Ford</u>, 241 F.3d 69, 75 (1st Cir. 2001) (quoting 28 U.S.C. § 2680(h)). Actions brought pursuant to the FTCA are governed by the "law of the place" where the alleged tortious act or omission occurred. <i>See</i> <u>Escalera-Salgado v. United States</u>, 911 F.3d 38, 40 (1st Cir. 2018) (citing 28 U.S.C. § 1346(b)(1)). Given that the alleged malicious prosecution occurred in Puerto Rico, Puerto Rico law controls.

A successful claim for malicious prosecution in Puerto Rico requires that plaintiff show: "(1) that a criminal action was initiated or instigated by the defendants; (2) that the criminal action terminated in the favor of plaintiff; (3) that defendants acted with malice and without probable cause; and (4) that plaintiff suffered damages." <u>Dominguez v. Figueroa Sancha</u>, 373 F. Supp. 3d 333, 344-45 (D.P.R. 2019) (quotation omitted). The First Circuit has reiterated that the third element is **two** separate elements given that "plaintiff must show <u>both</u> that the defendant

acted with malice <u>and</u> that he acted without probable cause." <u>Díaz-</u>
<u>Nieves</u>, 858 F.3d at 688 (quotation omitted) (emphasis in original).

In the context of malicious prosecution, Puerto Rico courts
define probable cause as "a suspicion founded upon circumstances
sufficiently strong to warrant a reasonable man in the belief that
the charge is true." <u>Abreu-Guzman</u>, 241 F.3d at 75 (quotation
omitted). Courts have also held that the determination of probable
cause "**does not depend upon whether or not the offense was**
**committed, but on the belief of the** *accuser* **in the truth of the**
**charge made by him.**" <u>Díaz-Nieves v. United States</u>, 128 F. Supp. 3d
449, 456 (D.P.R. 2015), <u>aff'd,</u> 858 F.3d 678 (1st Cir. 2017)
(quotation omitted) (emphasis added). Moreover, the United States
Supreme Court has held that "[a]n indictment fair upon its face,
and returned by a properly constituted grand jury, conclusively
determines the existence of probable cause and requires issuance
of an arrest warrant without further inquiry." <u>Paret-Ruiz v. United</u>
<u>States</u>, 2014 WL 12726063, at *3 (D.P.R. 2014) (quoting <u>Gerstein v.</u>
<u>Pugh</u>, 420 U.S. 103, 117 n. 19 (1975)); *see also* <u>Gonzalez Rucci v.</u>
<u>U.S. I.N.S.</u>, 405 F.3d 45, 49 (1st Cir. 2005) ("Generally, a grand
jury indictment definitively establishes probable cause.") An
exception to this rule arises **only** when "law enforcement defendants
**wrongfully obtained the indictment by knowingly presenting false**
**testimony** to the grand jury." <u>Gonzalez Rucci</u>, 405 F.3d at 49
(emphasis added).

In terms of malice, Puerto Rico courts compare this concept with bad faith. *See* Barros-Villahermosa v. United States, 642 F.3d 56, 59 (1st Cir. 2011). This means that plaintiff must show that the accusation brought by defendants against them was "(1) capricious and (2) without a rational basis." Díaz-Nieves, 858 F.3d at 457 (quotation omitted). Sister courts within the First Circuit have also defined malice as "any wrong or unjustifiable motive" which "may be inferred from a lack of probable cause." Campbell v. Casey, 166 F.Supp.3d 144, 153 (D. Mass. 2016). Failure to prove **any** of the elements of malicious prosecution described above is dispositive. *See* Barros-Villahermosa, 642 F.3d at 59.

## V. ANALYSIS

Here, Defendant agrees that Plaintiffs meet three of the four elements of malicious prosecution, namely the first, second and fourth elements. (Docket No. 131 at 17). A criminal action was instigated against Lozada-Manzano in the form of Criminal Case No. 13-cr-0292. Id. The action terminated in his favor because the case was dismissed without prejudice. Id. Moreover, Defendant acknowledges that Lozada-Manzano suffered damages from his ten-month imprisonment. Id. The remaining third element, *i.e.* whether defendants acted with malice *and* without probable cause, is the central issue in the case at bar.

Plaintiffs aver in their MSJ that when prosecuting Lozada-Manzano, the United States and its agents acted maliciously and

without probable cause by falsifying evidence, withholding
exculpatory evidence, and lying to the Grand Jury to secure an
indictment against him. (Docket No. 126 at 8). They posit, for
example, that Defendant fabricated Task Force Officer Lester
Perez-Difre's false official statement alleging a change in the
hour of the home invasion and carjacking so that the Government
could then place Lozada-Manzano at the scene of the crime and
indict him for those crimes. Id. at 6. Plaintiffs also claim that
Agent Oliva presented false information as part of his testimony
before the Grand Jury. Id. Further, they state that Defendant
failed to disclose exculpatory evidence including "fingerprint
analysis, knowledge that the robbers were masked, the doubts that
the identifying minors had about the identification, the amount of
robbers present and the fact that the prosecutor knew that
plaintiff Lozada was not present at Country Club, Carolina during
the robbery." Id.

In its Cross-MSJ, the Government generally maintains that
Plaintiffs have failed to prove that its agents acted with malice
and without probable cause. (Docket No. 131 at 18-19). Defendant
mainly avers that at the time of the Plaintiff's indictment in
2013, it had "robust probable cause" stemming from the three
identifications of Lozada-Manzano by the minor victims. Id. at 23.
Defendant contends that after the indictment, the investigation
continued its course until Lozada-Manzano's then counsel, Counsel

Rivera, presented an alibi on March 2014. Id. at 22. For reasons
stated below, the Court agrees with Defendant.

**A. Probable Cause**

Throughout their MSJ, Plaintiffs main theory is that
Defendant's reliance on the three minor victims' identification of
Lozada-Manzano to establish probable cause is misguided. This in
part because Mr. Caloca and Sadie, the adult victims interviewed
as part of the criminal proceedings against Lozada-Manzano, *could
not* identify the robbers. (Docket No. 126 at 17 and 24). Plaintiffs
also highlighted the fact that the minors purportedly voiced
concerns to the agents conducting the photo arrays as to their
identifications of Lozada-Manzano. Id. at 17. These concerns were
allegedly never notified to Lozada-Manzano's counsel during the
criminal proceedings. Id. at 17-18. They also aver that the minors'
identifications were tainted by the fact that the robbers wore
masks, which was also supposedly never relayed to Lozada-Manzano's
counsel at the time nor to the grand jury. Id. at 17-18, 24. Hence,
Plaintiffs claim that "the totality of the circumstances renders
the identification [of Lozada-Manzano] unreliable." Id. at 17.

1. The Government can rely on single eyewitness identification
to make a finding of probable cause

Simply because some of the victims were not able to identify
the alleged perpetrators, does not disqualify the identification
of Lozada-Manzano by the remaining minor victims. The First Circuit

has held that the testimony of a **single eyewitness suffices** for a criminal conviction. In <u>United States v. Lanza-Vazquez</u>, the First Circuit stated that "[a] criminal conviction can rest on the testimony of a single eyewitness. **Even if the eyewitness's testimony is uncorroborated and comes from an individual of dubious veracity, it can suffice to ground a conviction.**" <u>United States v. Lanza-Vazquez</u>, 799 F.3d 134, 148 (1st Cir. 2015) (quoting <u>Foxworth v. St. Amand</u>, 570 F.3d 414, 426 (1st Cir. 2009) (emphasis added).

　　2. <u>The number of robbers is irrelevant to this malicious prosecution claim</u>

　　　The difference between the number of robbers does not make the identification of Lozada-Manzano unreliable either. Most of the victims stated there were two robbers in the home invasion and carjacking. (Facts ¶¶ 1, 3, 11-12, 22 and 26). But at least one of the victims, Andrick, testified in his deposition that he believed there were more than two robbers. (Facts ¶¶ 65, 68). Hence, the fact that Agent Oliva testified before the Grand Jury that there were three robbers, not two, and with Lozada-Manzano being the third robber, does not in itself show malicious prosecution on behalf of the Government. (Facts ¶¶ 96-97). This alleged discrepancy between the number of perpetrators also fails to create a genuine issue of material fact sufficient to overcome summary judgment. Ultimately, regardless of the number of perpetrators, three minors positively identified Lozada-Manzano in the photo

arrays. _See e.g._, <u>Batson-Kirk v. City of New York</u>, 2009 WL 1505707, at *1 (E.D.N.Y. 2009)(holding in a malicious prosecution claim pursuant to 42 U.S.C. § 1983 that "any dispute regarding the date of one the assaults or the number of assailants does not raise a genuine issue of material fact warranting trial.")

   3. <u>The victims' ages do not automatically disqualify their photo identifications of Lozada-Manzano</u>

The Court is also not swayed by Plaintiffs skeletal argument that the mere fact that the three victims were children renders their identifications false positives. (Docket No. 126 at 18). Plaintiffs claim that "[t]here are also memorable instances when children make particularly wild accusations that are not sustainable by obvious facts such as identifying a person that was masked and that more incredibly was already under custody." <u>Id.</u> Yet these conclusory allegations, without more, "offer no support for the proposition that an identification is unreliable simply because an eyewitness is young or inclined to trust the police." <u>Robinson v. Cook</u>, 706 F.3d 25, 35 (1st Cir. 2013). The fact that Jadie, Andrick and Alondra were the only witnesses who identified Lozada-Manzano and the fact that they were minors at the time of their respective identification processes **does not mean that their identifications were inherently unreliable**.

   Similarly, Plaintiffs' argument that Jadie was alone at least on one occasion with federal agents during the photo identification

process does not, by itself, suffice to show that her identification of Lozada-Manzano was tainted. (Fact ¶ 60). All three minor victims **testified in their depositions that they were not coerced into selecting Lozada-Manzano as one of the perpetrators of the robbery**. (Facts ¶¶ 57-58, 61, 72 and 83). *Cf.* Oliva v. Hedgpeth, 600 F. Supp. 2d 1067, 1083 (C.D. Cal. 2009), aff'd sub nom. Pineda Oliva v. Hedgpeth, 375 F. App'x 697 (9th Cir. 2010) (finding that the photographic identification by a six-year old was unreliable due to the detective's leading questions which caused the witness's withdrawal of her first selection and the detectives' praise for the minor's selection following her identification of another photograph in the array). Moreover, at least one of the minor victims, Alondra, stated that she did not discuss who participated in the robbery with her family. (Fact ¶ 84). Thus, all the minor victims selected Lozada-Manzano separately.

All three minor victims testified that they were with their mother when they circled Lozada-Manzano's picture. (Facts ¶¶ 62, 75 and 85). Sadie also answered "no" to questions from Defendant's counsel if the Police ever forced her children to lie or if the agents pointed out or suggested that the people in the photo arrays had committed a crime. (Facts ¶¶ 91-92). She also answered affirmatively to Defendant's counsel's questions whether the

identification of Lozada-Manzano by her children was "freely and voluntary[.]" (Fact ¶ 93).

    4. <u>The fact that the robbers wore masks and that the minor victims provided limited descriptions of the perpetrators does not necessarily lead to an unreliable identification</u>

    The mere fact that the robbers were masked does not mean that the victims' identifications of Lozada-Manzano were automatically unreliable either. The Court notes that at least one of the minors, Alondra, testified that she remembered telling the agents she was uncertain of her identification. (Fact ¶ 80). Yet, she also testified that even if she was uncertain, she **"always said that that was the one that looked more like [the robber] to [her]."** (Fact ¶ 79). All the minors unequivocally stated that they picked Lozada-Manzano out of the lineup because he was the one that looked the *most* like the robber to them. (Facts ¶¶ 58, 69, 79-80). Andrick even stated that "[f]rom the very beginning it was mentioned that the persons were masked and that what [the victims] were going to be circling were persons that somewhat looked like or were alike." (Fact ¶ 69). Sadie also testified that she believed her children circled Lozada-Manzano because he was the assailant who most resembled who they thought was one of the robbers. (Fact ¶ 88).

    Moreover, both the First Circuit and courts within the First Circuit have upheld witness identifications of a perpetrator even when the eyewitness's opportunity to view assailants "was hampered

by the assailants' intermittent use of masks and blindfolds."
United States v. Rosser-Stewart, 2020 WL 1939718, at *3 (D. Mass.
2020) (quoting United States v. Garcia-Alvarez, 541 F.3d 8, 14
(1st Cir. 2008). Therefore, the alleged lack of disclosure to the
grand jury or counsel that the robbers were masked, does not make
Lozada-Manzano's identification unreliable. (Docket No. 126 at 17-
18). Multiple Circuit Courts of Appeals have likewise found that
an identification of a defendant as someone who "looked like" or
resembled the perpetrator was sufficient for identification
purposes. See e.g., United States v. Brewer, 36 F.3d 266, 269-70
(2d Cir. 1994) (witnesses' statements that defendant robber
"resembled" or "looked like" one of the bank robbers did not make
the evidence insufficient); United States v. Smith, 563 F.2d 1361,
1363 (9th Cir. 1977), cert. denied, 434 U.S. 1021, (1978) (witness
statement that defendant "look[ed] like" the robber sufficient).

Lastly, the Court recognizes that the victims' description of
Lozada-Manzano is less than ideal. But, Jadie and Andrick also
testified that they selected Lozada-Manzano because they
recognized a part of the face not covered by the mask and
sunglasses, the "shape of his head," "shape of his face," his
"facial characteristics" or his "factions." (Facts ¶¶ 49-52 and
70). Several Circuit Courts of Appeals and District Courts have
held that an identification based on the shape of a person's face,
limited facial characteristics or general build is reliable. See

*e.g.*, United States v. Bell, 812 F.2d 188, 192-93 (5th Cir. 1987) (evidence was sufficient to uphold identification of where, barring some inconsistencies with defendant's description, victim identified him as the person who abducted her because she recognized his eyes through his ski mask); United States v. Domina, 784 F.2d 1361, 1370 (9th Cir. 1986) (pretrial identification was not suggestive when witness was able to identify masked robber because of the shape of his nose and face, part of his face not covered by a mask, and his general build); Murray v. Steele, 2020 WL 4201425, at *6 (E.D. Mo. 2020)(holding that photographic and in court identifications were reliable when an eyewitness identified plaintiff by his "distinctive forehead" not covered during the robbery); United States v. Clayborne, 425 F. Supp. 3d 1047, 1059 (E.D. Wis. 2019) (upholding photo identification of robber based on "the shape of the head, skin complexion, shape of the nose, style of facial hair, and physical build"); Garcia v. Uribe, 2009 WL 1464398, at *7-8 (C.D. Cal. 2009) (upholding identification where defendant identified the robber even though he wore a hood and bandanna and the victim could only see from his forehead to the tip of his nose). Not informing Lozada-Manzano's counsel or Grand Jury that the robbers had worn masks does not invalidate the identifications.

5. Plaintiffs have not shown the photos in the photo arrays were placed in a suggestive order

The Court notes that Sadie replied "yes" to questions from Defendant's counsel whether the same person was circled in all three photo arrays signed by her children. (Fact ¶ 89). She also replied "yes" to questions regarding whether the photos in the arrays were in a different order and if it was the same person just in different order. (Fact ¶ 90). Plaintiffs have not proffered any admissible evidence of how the law enforcement officials arranged the photo arrays in a suggestive manner. While neither party has brought forth an analysis of the "suggestiveness" of the photo-identification, the Supreme Court has outlined a two-step analysis for deciding whether a pretrial identification is admissible. *See* Manson v. Brathwaite*,* 432 U.S. 98, 110 (1977); Neil v. Biggers*,* 409 U.S. 188, 198-99 (1972). The first step in the analysis is determining whether a photographic lineup was impermissibly suggestive. Id. The second step consists of examining "whether under the totality of the circumstances the suggestiveness is so pronounced that there is a serious likelihood of irreparable misidentification." United States v. Hilario-Hilario, 529 F.3d 65, 71 (1st Cir. 2008). To conduct the second step of this analysis, the Court should turn to the various factors set out in Neil v. Biggers. *See* Neil, 409 U.S. at 199. Here, however, the Court finds that the photo arrays signed by the minor

victims were not impermissibly suggestive. Hence, the court need not address the application of the individual <u>Biggers</u> factors as required by the second step. The District of Puerto Rico has held that **"if and only if, [the] court finds that the first prong is satisfied, is it to address the second prong of the test."** <u>United States v. Pomales Arzuaga</u>, 2017 WL 10360081, at * 4(D.P.R. 2017), <u>report and recommendation adopted,</u> 319 F. Supp. 3d 578 (D.P.R. 2018) (quoting <u>United States v. Jackman</u>, 837 F.Supp. 468, 470 (D. Mass. 1993)). Without more than the conclusory allegations stated above, the Court finds that the photographic identification of Lozada-Manzano was reliable and could be used to determine probable cause to indict Lozada-Manzano.

Lastly, the First Circuit has previously discussed whether photographic identification supported a finding of probable cause in a <u>Bivens</u> claim for malicious prosecution *without* utilizing the <u>Braithwaite</u> framework. *See* <u>Abreu-Guzman</u>, 241 F.3d at 74. Instead, "the best course is to continue to weigh probable cause […] by asking whether a given piece of information—including an allegedly unreliable identification—is trustworthy enough that a reasonably prudent person would rely on it in forming a belief about the suspect's conduct." <u>Cook</u>, 706 F.3d at 34. Here, the Court ultimately finds that a reasonably prudent person would consider the photo arrays trustworthy enough to rely on them when finding probable cause to indict Lozada-Manzano.

## B. Malice

Similarly, the Court also finds that Plaintiffs have failed to show that Defendant, or any related actor, acted with malice during the criminal proceedings against Lozada-Manzano. The Government conducted three photo identification procedures on three different dates with three minors who all circled Lozada-Manzano. The positive identifications by the minors established a sufficient basis to seek an indictment against Lozada-Manzano.

### 1. The negligent investigation claim against defendant was already dismissed

The Court notes that the supposed improper conduct by Defendant's agents currently being alleged by Plaintiffs is practically *identical* to their original negligent investigation claim, which the Court already dismissed. (Docket No. 38 at 2). The District Court made an analogous finding in Díaz-Nieves v. United States. *See* Díaz-Nieves, 128 F. Supp. 3d at 458. In Díaz-Nieves, also a malicious prosecution case under the FTCA, the Court held that "the theory of improper conduct now pressed by plaintiffs is essentially identical to the theory underlying their negligent investigation claim, which the court previously dismissed." Id. The Court also explained that the plaintiffs "basically claim that the government should have done a better job identifying the right corrupt corrections officer. [...] Plaintiffs have not alleged facts indicating that the FBI acted with the intent to harm [Diaz

Nieves], but merely that they suffered harm" due to an alleged failure to identify the correct corrupt officer. Id.

Plaintiffs' claims of negligent investigation in their *Complaint* stemmed from the **same factual allegations** as those related to the malicious prosecution claim. Plaintiff averred that "[t]he named defendant in this action and the negligently supervised FBI agents continued to impede the liberation of plaintiff Lozada-Manzano, even knowing of his innocence." (Docket No. 1 at 10). They further held that "[t]he agents maliciously and negligently and with willful disregard of due care, influenced the children into wrongly identify[ing] [Lozada-Manzano] as the perpetrator of the crime at Urbanización Country Club in Carolina[.]" Id. at 11. Lastly, they claimed that "the United States of America, by its employees and supervisors, carelessly and negligently failed to maintain proper investigative techniques that if correctly applied to the case at hand would have exculpated plaintiff Lozada-Manzano from all criminal guilt above and beyond reasonable doubt." Id. at 12.

### 2. The Collective Knowledge Doctrine is inapplicable

In another attempt to show malice by Defendant's agents, Plaintiffs' MSJ also posits that "the collective knowledge of law enforcement officers involved in the investigation (including the prosecutor), viewed objectively, did not establi[sh] probable cause to indict the defendant." (Docket No. 126 at 5). In essence,

they claim that knowledge of T.F.O. Pérez-Difre's false statement
as to hour of the home invasion and carjacking is attributable to
all law enforcement agents involved in the criminal proceedings
against Lozada-Manzano. Id. The First Circuit has explained that
the collective knowledge doctrine applies "[w]here law enforcement
authorities are cooperating in an investigation ... the knowledge
of one is presumed shared by all." Solis-Alarcon, 662 F.3d at 581
(quoting Illinois v. Andreas, 463 U.S. 765, 771 n. 5, (1983)).
However, other Circuit Courts have held that "the doctrine has
traditionally been applied to *assist* officers in establishing
probable cause—**not to impute bad faith to one member of an
enforcement team on the basis of another member's knowledge**."
Savino v. City of New York, 331 F.3d 63, 74 (2d Cir. 2003) (emphasis
in original) *see also* Stukes v. City of New York, 2015 WL 1246542,
at *7 (E.D.N.Y. 2015)(stating in a malicious prosecution case under
42 U.S.C. § 1983 that "possible negligence in failing to discover
or forward exculpatory evidence is insufficient to rebut the
presumption created by the indictment."). Thus, Plaintiffs cannot
rely on the alleged actions of T.F.O. Pérez-Difre to show that the
Prosecutor had no probable cause for Lozada-Manzano's indictment.

The record on summary judgment does not show that the
Government agents **or the Prosecutor** were aware of the alleged
falsified evidence and used it when making their determinations as
to the existence, or lack thereof, of probable cause. Furthermore,

Plaintiffs have failed to proffer *admissible* evidence showing that
SAUSA Soto had the alleged exculpatory evidence **before** commencing
the criminal proceedings and the indictment against Lozada-
Manzano. Even assuming *arguendo* that SAUSA Soto did have the
alleged exculpatory evidence, Plaintiffs "**have provided no
evidence that it was withheld from the grand jury**." Diaz-Nieves,
128 F. Supp at 449 (emphasis added). Other Circuits Court of
Appeals have also held that "it is the prosecutor, and not the
defendant police officers, 'who ha[s] the discretion and authority
to decide what evidence to present to the grand jury,' and the
prosecutor '[is] under no duty to present every item of arguably
exculpatory evidence in seeking an indictment.'" Burgess v.
DeJoseph, 725 F. App'x 36, 39-40 (2d Cir. 2018) (quoting Savino,
331 F. 3d at 75). Therefore, here just as in Díaz-Nieves, "[i]t is
[Plaintiffs] burden to prove government misfeasance sufficient to
defeat the presumption of probable cause generated" by Lozada-
Manzano's indictment. Diaz-Nieves, 128 F. Supp at 449. Here, as in
that case, "[n]o reasonable juror could infer from the current
record that the grand jury received tainted information regarding"
Lozada-Manzano's identity. Id. The First Circuit has reiterated
that "[t]hough the district court must 'interpret the record in
the light most hospitable to the nonmoving party, reconciling all
competing inferences in that party's favor,'[…] **the nonmovant has
a corresponding obligation to offer the court more than steamy**

rhetoric and bare conclusions." <u>Lawton v. State Mut. Life Assur.</u>
<u>Co. of Am.</u>, 101 F.3d 218, 222–23 (1st Cir. 1996) (internal
quotations and citations omitted) (emphasis added).

Plaintiffs seem to conflate malice and negligence under
Puerto Rico law. Puerto Rico law is clear that malice "**should be
perfectly alleged with facts, and never with mere legal
conclusions, without even establishing the facts they are derived
from.**" <u>Diaz-Nieves,</u> 128 F. Supp. 3d at 458 (quotation omitted).
Here, Plaintiffs have failed to proffer sufficient facts or
corroborating evidence to show that SAUSA Soto or Defendant's
agents acted without a rational basis in indicting Lozada-Manzano.

## VI. CONCLUSION

The record on summary judgment shows that: (1) the Government
acted without malice, and (2) probable cause existed to indict
Lozada-Manzano. Because failure to prove **any** of the elements of
malicious prosecution is dispositive, the Court **DENIES** Plaintiffs'
*Motion Requesting Summary Judgment* and *Plaintiff's [sic]
Uncontested Material Facts and of Law* at Docket Nos. 126 and 127
and **GRANTS** Defendant's *Answers to Plaintiff's Statements of
Uncontested Material Facts, Opposition to Plaintiff's Motion for
Summary Judgment and Cross Motion For Summary Judgment* at Docket
No. 131. Lastly, even assuming *arguendo* that Plaintiffs' state law
1802 and 1803 claims could be asserted independently of their
federal FTCA claim of malicious prosecution, the state law claims

are   hereby   **dismissed   with   prejudice**   for   the   same   reasons
underpinning dismissal of the FTCA claim. Judgment dismissing this
action with prejudice shall be entered accordingly.

      **IT IS SO ORDERED.**

    In San Juan, Puerto Rico, this 19th day of March 2021.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge
